# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 29, 2017

Lyle W. Cayce
Clerk

—————

No. 15-30987

—————

PLANNED PARENTHOOD OF GULF COAST, INCORPORATED; JANE
DOE #1; JANE DOE #2; JANE DOE #3,

> Plaintiffs - Appellees

v.

REBEKAH GEE, Secretary, Louisiana Department of Health and Hospitals,

> Defendant - Appellant

————————————

Appeal from the United States District Court
for the Middle District of Louisiana

————————————

Before WIENER, PRADO, and OWEN, Circuit Judges.

WIENER, Circuit Judge:

After this panel filed a unanimous opinion affirming the district court and a judge on this court then held the mandate, a panel member changed her position from agreeing to affirm the district court to advocating reversal. We therefore withdraw our original, unanimous opinion and replace it with two opinions: this one from the panel majority and another from our now-dissenting panel member.

## **NARROW FRAMEWORK**

First, the one and only act of the district court that is at issue in this appeal is its temporary injunction, granted at the outset of this litigation to

No. 15-30987

preserve the status quo among all the parties pending resolution of the substantive issues of this case. The parties to whom we refer are the defendant, the State of Louisiana, and the plaintiffs, Planned Parenthood of Gulf Coast, Incorporated ("PPGC") and three of its patients, each of whom is so financially disadvantaged as to qualify for Medicaid. The district court granted its injunction in recognition of the fact that, if the State's revocation of PPGC's Medicaid qualification was to become effective immediately, only to be reversed after months or years of litigation, the clinics' poorest patients would nevertheless have suffered permanent harm.

Second, the State is not attempting to completely shut down the two PPGC clinics in question; it seeks only to deny Medicaid coverage for the clinics' treatment of their most needy patients, i.e., those who qualify for Medicaid. It is only that threatened act of the State that the district court has temporarily enjoined pending the orderly disposition of the Medicaid issue in this litigation. The merits of this case are not now before us; this litigation has not even reached the summary judgment stage, much less the merits, but only the initial, Rule 12(b) stage.

Third, neither of PPGC's two Louisiana clinics threatened here with Medicaid decertification by the State performs abortions or has ever participated in a program involving donation of fetal tissue. We emphasize this facet of the litigation's framework for the benefit of those of our colleagues and our readership whose overarching anathema to Planned Parenthood is grounded in their opposition to abortions or donations of fetal tissue, or both.

It is within this narrow framework that we now address the sole issue of this appeal, the district court's pre-merits, status quo, injunction.

No. 15-30987

## BACKGROUND

Medicaid's free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23), guarantees that Medicaid beneficiaries will be able to obtain medical care from the qualified and willing medical provider of their choice. In response to secretly recorded videos released by the anti-abortion Center for Medical Progress depicting conversations with employees of an unrelated Planned Parenthood in a different state, Defendant-Appellant Louisiana Department of Health and Hospitals ("LDHH") terminated only the Medicaid provider agreement of Plaintiff-Appellee PPGC, leaving it licensed to provide its services to any and all non-Medicaid patients. PPGC and the individual Plaintiffs-Appellees Jane Doe #1, Jane Doe #2, and Jane Doe #3 (the "Individual Plaintiffs")—women who are Medicaid beneficiaries and receive medical care provided at one of PPGC's Louisiana facilities—(collectively "the Plaintiffs") filed this suit against LDHH under 42 U.S.C. § 1983, alleging violations of 42 U.S.C. § 1396a(a)(23) and the First and Fourteenth Amendments of the U.S. Constitution. Each Individual Plaintiff seeks to continue receiving care from PPGC's facilities, and each specifically contends that LDHH's termination action will deprive her of access to the qualified and willing provider of her choice, in violation of Medicaid's free-choice-of-provider provision.

The district court entered a preliminary injunction against LDHH's termination of PPGC's Medicaid provider agreements pending the eventual outcome of this litigation on the merits. LDHH appeals.

## FACTS

### A. Plaintiffs-Appellees

1. PPGC is a non-profit corporation domiciled in Texas and licensed to do business in Louisiana. It operates two clinics in Louisiana: the Baton Rouge

No. 15-30987

Health Center and the New Orleans Health Center. Both centers participate in Louisiana's Medicaid program. PPGC's two clinics provide care to over 5200 Medicaid beneficiaries, who comprise more than half of the patients they serve in Louisiana. Both clinics offer physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treating specified sexually transmitted diseases, pregnancy testing and counseling, and other listed procedures, including colposcopy. Again, neither clinic performs abortions nor has either ever participated in a fetal tissue donation program.

2. Doe #1 relies on PPGC's health center in Baton Rouge for her annual examinations. According to Doe #1, PPGC also helped her obtain treatment for cancer in December 2013. Her cancer is now in remission, but it has rendered her unable to take birth control pills. She does not wish to have any more children and continues to rely on PPGC to advise her on future contraception options. Doe #1 wishes to continue receiving health care at PPGC because she does not know of any other providers that will take her insurance. She prefers to receive care at PPGC because she is comfortable with the staff, trusts the providers, and is easily able to make appointments.

3. Doe #2 is enrolled in Louisiana's Take Charge Plus program[1] and has received care at PPGC's health center in New Orleans since 2012. Until health issues left her unable to work full time, at which point she lost her private health insurance, Doe #2 had used a private obstetrician-gynecologist. That physician stopped treating Doe #2 once she lost her private insurance. Doe #2 now visits PPGC every year for her annual gynecological examination. She

---

[1] The Take Charge Plus program provides family planning services to eligible women and men with incomes at or below 138 percent of the federal poverty level.

prefers to continue receiving it from PPGC and does not know where else she could obtain this care under Medicaid.

4. Doe #3 is a patient of PPGC's health center in Baton Rouge. There, she receives pap smears, testing for sexually transmitted diseases, and cancer screenings. Doe #3 prefers receiving care at PPGC and finds it is easy to make appointments there. She states that it "is very difficult to find doctors in Baton Rouge who will accept Medicaid." Doe #3 needed to visit another Baton Rouge clinic for a necessary gynecological procedure, but was given an appointment for a day seven months later.

**B. History**

In July 2015, the anti-abortion Center for Medical Progress, released a series of undercover videos and allegations purporting to show that Planned Parenthood and its affiliates were contracting to sell aborted human fetal tissue and body parts. At a later hearing, the district court found that "none of the conduct in question [depicted in the videos] occurred at PPGC's two Louisiana facilities." Nevertheless, then-Louisiana Governor Bobby Jindal directed LDHH and the State Inspector General to investigate PPGC.

On July 15, 2015, then-secretary of LDHH, Kathy Kliebert, wrote to PPGC requesting responses to a range of questions about its activities. PPGC promptly responded on July 24, 2015, relevantly stating that (1) it "does not offer abortion services," and (2) it does not sell or donate any unborn baby organs or body parts. PPGC acknowledged that Planned Parenthood Center for Choice, Inc. ("PPCFC"), a separate corporation,[2] provides abortions in Texas, but that PPCFC does not operate a fetal tissue donation program.

---

[2] As PPGC's letter indicates, PPCFC was operated as a division of PPGC until 2005, at which point it was separately incorporated in Texas. PPCFC also has a Certificate of Authority to Transact Business in Louisiana.

Secretary Kliebert wrote to PPGC on August 4, 2015, claiming that several of PPGC's responses "directly contradict" the recently released videos. According to her, one video taken in Houston, Texas, depicted Melissa Farrell, Director of Research at PPGC, "discuss[ing] existing contracts for fetal tissue donation for the purpose of research." Secretary Kliebert emphasized that LDHH "is extremely concerned that [PPGC or PPCFC], or both have not only participated in the sale or donation of fetal tissue, but also deliberately misinformed [LDHH] about this practice in its July 24 response letter." In that same letter, Secretary Kliebert requested more information about the practices of PPGC and PPCFC.

PPGC responded on August 14, 2015, repeating that neither PPGC nor PPCFC sells or donates fetal tissue. PPGC explained that the secretly recorded conversation "does not discuss existing contracts for fetal tissue donation," but rather, "concerns a list of tissue specimens a major Texas research institution had expressed interest in obtaining, in discussions about a possible future fetal tissue donation program."

In the midst of these communications, LDHH notified PPGC on August 3, 2015, that it would terminate PPGC's Medicaid provider agreements. Secretary Kliebert stated no basis for the termination. She noted only that under La. R.S. § 46:437.11 the provider agreements are voluntary contracts subject to termination "by either party 30 days after receipt of written notice." That same day, then-Governor Jindal published the following press release: "Governor Jindal and DHH decided to give the required 30-day notice to terminate the Planned Parenthood Medicaid provider contract because Planned Parenthood does not represent the values of the State of Louisiana in regards to respecting human life." Secretary Kliebert's letter notified PPGC of its right to a hearing and stated that PPGC may request an administrative

appeal within 30 days. At a subsequent hearing before the district court, LDHH's counsel clarified that this termination action by the state did *not* relate to PPGC's ability to continue providing adequate care to its non-Medicaid patients.[3]

## C. The Instant Proceedings

On August 25, 2015, the Plaintiffs filed suit under 42 U.S.C. § 1983, contending that LDHH's termination of PPGC's Medicaid provider agreements violated Medicaid's free-choice-of-provider requirement, 42 U.S.C. § 1396a(a)(23), and the U.S. Constitution. On that date, the Plaintiffs also moved for entry of a temporary restraining order and preliminary injunction, which the district court eventually granted. The validity of that *preliminary* injunction is the one and only issue of this appeal.

LDHH voluntarily rescinded the August 4, 2015 "at will" termination letters on September 14, 2015. On that same day, LDHH advised the district court by letter that it believed that the Plaintiffs' claims and pending motions were now moot. But the very next day, September 15, 2015, LDHH notified PPGC that it was "terminating/revoking" PPGC's Medicaid provider agreements for "cause" under La. R.S. §§ 46:437.11(D)(2) and 437.14, and Title 50 of the Louisiana Administrative Code. LDHH also informed PPGC that it

---

[3] The district court asked LDHH's counsel several questions pertaining to this issue:

> **THE COURT:** All right. So the reason [for LDHH's termination action] is unrelated to the ability of these two facilities to provide adequate care to their patients; is that true?

> **MR. RUSSO:** That I would agree with, yes, sir.

> **THE COURT:** So Ms. Kliebert's position is that these are terminated without a relationship of any kind to the adequacy of care; correct?

> **MR. RUSSO:** Correct, at this time, your honor, exactly.

could request an informal hearing or suspensive administrative appeal within 30 days (PPGC has not requested either a hearing or an administrative appeal). LDHH further notified PPGC that the effected terminations would be suspended during this 30-day period.

LDHH has advanced three grounds for termination. First, LDHH identified PPGC's settlement of a qui tam False Claims Act ("FCA") claim in *Reynolds v. Planned Parenthood Gulf Coast, Inc.*,[4]—in which PPGC disclaimed all liability—and its failure to notify LDHH of that settlement and any corresponding violations. LDHH categorized these acts as "fraud." LDHH identified a second qui tam FCA claim against PPGC in *Carroll v. Planned Parenthood Gulf Coast.*[5] At the time of the proceedings before the district court in the instant case, the court in *Carroll* had denied PPGC's motion to dismiss. LDHH identified the *Carroll* suit as another example of PPGC's failure to comply with applicable laws and to notify LDHH of such violations. PPGC subsequently settled that suit, again disclaiming all liability.

Second, LDHH stated that PPGC's responses in its July and August letters contained misrepresentations. LDHH did not identify any particular misrepresentations either in its August 3 termination letter or before the district court. At most, LDHH urged that PPGC's responses differed from the content of the videos released by the Center for Medical Progress.

Finally, LDHH claimed that PPGC was subject to termination because it was being investigated by LDHH and the Louisiana Office of Inspector General.

On October 7, 2015, the Plaintiffs filed a motion to amend their complaint, seeking to continue asserting their claims under Medicaid's free-

---

[4] No. 9:09-cv-124-RC (E.D. Tex.).

[5] No. 4:12-cv-03505 (S.D. Tex.).

choice-of-provider provision and to add claims under the First and Fourteenth Amendments of the U.S. Constitution. Two days later, the Plaintiffs also renewed their request for a temporary restraining order and preliminary injunction.

LDHH moved to dismiss the Plaintiffs' amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). After a hearing on the parties' motions, the district court granted in part the Plaintiffs' motion for temporary restraining order and preliminary injunction and denied LDHH's motion to dismiss. The district court held a subsequent telephone conference with the parties, at which point both sides consented to converting the temporary restraining order to a preliminary injunction to allow for an immediate appeal. The parties agreed that no evidentiary matters required further discovery.

The district court issued an amended ruling and order in October 2015, granting the Plaintiffs' renewed motion for temporary restraining order and for preliminary injunction and denying LDHH's motion to dismiss. The district court thus preliminarily enjoined LDHH from terminating PPGC's Medicaid provider agreements during the pendency of this litigation. In a lengthy and detailed opinion, the district court rejected LDHH's standing, ripeness, and abstention challenges to the Plaintiffs' claims. The court also found sufficient grounds to issue a preliminary injunction on the basis of the Individual Plaintiffs' claim under Medicaid's free-choice-of-provider provision. The district court specifically held that 42 U.S.C. § 1396a(a)(23) affords the Individual Plaintiffs a private right of action enforceable under 42 U.S.C. § 1983. The court expressly declined to determine whether PPGC possesses such a right. The court then held that the Individual Plaintiffs' claims are substantially likely to succeed and that the remaining factors— irreparable

No. 15-30987

injury to the Plaintiffs, balancing of the injury to the Plaintiffs versus the harm to the defendant, and the public interest—weigh in favor of issuing a preliminary injunction.

LDHH appealed, contending that the district court erred in concluding that the Individual Plaintiffs have standing and that their claims are ripe for review. It further asserts that the district court erred in entering a preliminary injunction.

## JUSTICIABILITY

Article III of the U.S. Constitution extends the federal judicial power to "Cases" and "Controversies."[6] The justiciability requirements of standing and ripeness animate Article III's cases-and-controversies requirement in this appeal. LDHH maintains that the Plaintiffs lack standing to bring their claims and that their claims are not ripe for review. The district court issued the preliminary injunction as to the Individual Plaintiffs' claims alone, so we confine our analysis to the justiciability of those plaintiffs' claims.[7]

### A. Standing

LDHH first avers that the Individual Plaintiffs lack standing to assert their claims. We review challenges to standing de novo.[8] To establish standing, a plaintiff must prove that (1) he has sustained an "injury in fact" that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical," (2) there is "a causal connection between the injury and the conduct complained of," and (3) a favorable decision is likely to redress the

---

[6] U.S. CONST. art. III, § 2, cl. 1.

[7] Therefore, we decline to address LDHH's arguments related to the justiciability of PPGC's claims.

[8] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011).

injury.[9] "An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur."[10]

LDHH posits that the Individual Plaintiffs have failed to demonstrate an injury because PPGC's Medicaid provider agreements have not yet been terminated and the Individual Plaintiffs have not yet been denied access to PPGC's services. LDHH further maintains that any injury will result not from its actions, but from PPGC's failure to avail itself of its administrative appeal rights.

The Individual Plaintiffs counter that they have standing because LDHH has acted to terminate PPGC's Medicaid provider agreements, which will (1) deny them access to the healthcare services they seek and (2) deny them a legal right, *viz.*, access to the qualified and willing provider of their choice under 42 U.S.C. § 1396a(a)(23). Stated differently, the Individual Plaintiffs will sustain a concrete and particular injury (denial of services from PPGC and a legal right to the qualified provider of their choice) caused by LDHH (termination of PPGC's Medicaid provider agreements) that will be redressed by a favorable decision (an injunction barring LDHH from terminating PPGC's Medicaid provider agreements).

At the heart of LDHH's challenge to the Individual Plaintiffs' standing is its insistence that, because PPGC's Medicaid provider agreements have not yet been terminated, the Individual Plaintiffs have not sustained injury. This argument ignores the well-established principle that a threatened injury may

---

[9] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

[10] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147, 1150, n.5 (2013)).

be sufficient to establish standing.[11] As LDHH itself says, "[t]hreatened injury must be certainly impending to constitute injury in fact."[12] LDHH has notified PPGC that it has terminated PPGC's Medicaid provider agreements, but has suspended the effect of those terminations pending PPGC's decision whether to pursue an administrative appeal. PPGC has stated that it will not avail itself of administrative appeal. In other words, LDHH has already acted to terminate PPGC's Medicaid provider agreements; only the *effect* of that termination has yet to be implemented. And, importantly, the Individual Plaintiffs have no administrative appeal rights, and they are not subject to (nor could they be) any administrative exhaustion requirement under 42 U.S.C. § 1983.[13] The Individual Plaintiffs thus need not wait to file suit until PPGC is forced to close its doors to them and all other Medicaid beneficiaries.

LDHH also argues that the Individual Plaintiffs have not and will not sustain any legal injury—presumably even when the termination of PPGC's provider agreements takes effect—because the Individual Plaintiffs have a right to choose only a "qualified" provider, and PPGC is no longer a qualified provider. This contention turns on the sole substantive question before us on appeal, and we decline to allow LDHH to bootstrap this issue into our standing inquiry. We also note that a violation of a statutory right, even standing alone, may be sufficient to satisfy the injury requirement: "Congress may create a statutory right of entitlement the alleged deprivation of which can confer

---

[11] *See Comsat Corp. v. FCC*, 250 F.3d 931, 936 (5th Cir. 2001) ("A threatened injury satisfies the injury in fact requirement so long as that threat is real rather than speculative."); *Loa-Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000) ("Mere threatened injury is sufficient, and the threat in this case is real.").

[12] *Clapper*, 133 S. Ct. at 1147–48 (2013) (internal quotation marks omitted) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)).

[13] LDHH concedes separately that "exhaustion is often not a barrier to a claim based on 42 U.S.C. § 1983."

standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute."[14]

LDHH finally contends that even if an injury exists, it is not fairly traceable to LDHH. Instead, asserts LDHH, PPGC's decision not to avail itself of an administrative appeal will alone be the cause of the Individual Plaintiffs' injury. The Supreme Court has warned against "wrongly equat[ing] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."[15] Although injury resulting from "the *independent* action of some third party not before the court" will not suffice, "that does not exclude injury produced by determinative or coercive effect upon the action of someone else."[16] LDHH is essentially asking us to conduct a proximate cause analysis to determine the immediate cause of the Individual Plaintiffs' injuries, but this is not what the Supreme Court requires.[17] We therefore affirm the district court's determination that the Individual Plaintiffs have standing to pursue their claims.

## B. Ripeness

LDHH next asserts that the Individual Plaintiffs' claims are not ripe. It argues that those claims are not fit for review because no injury has occurred and that the administrative process and the factual development it entails are still pending. LDHH goes so far as to claim that, for an issue to be ripe for review, this court requires a full administrative record.

---

[14] *Warth v. Seldin*, 422 U.S. 490, 514 (1975); *see also Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.").

[15] *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

[16] *Id.* at 169 (internal citations omitted) (emphasis in original).

[17] *See City of Boerne*, 659 F.3d at 431 ("The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." (citing *Bennett*, 520 U.S. at 168–69)).

No. 15-30987

We review de novo the issue of ripeness.[18] In evaluating whether a case is ripe for adjudication, we balance "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration."[19] "A case is generally ripe if any remaining questions are purely legal ones."[20]

We conclude that the Individual Plaintiffs' claims are ripe for review because the issues before us present purely legal questions. LDHH has already terminated PPGC's Medicaid provider agreements, and it has proffered three specific grounds for doing so. The operative question on appeal is whether, as a matter of law, any of those grounds permit LDHH to terminate PPGC's Medicaid provider agreement without violating Medicaid's free-choice-of-provider requirement. Further, although PPGC had the option to engage in the administrative appeal process, it has elected not to do so. And, as noted by the district court, LDHH had already terminated PPGC's provider agreements with "its 'effect' alone delayed." LDHH's own briefing implies the same: "The initial decision maker, the State of Louisiana, through LDHH, has not taken final action on the issue of whether PPGC's provider contracts *were properly terminated.*"[21]

The Individual Plaintiffs' injuries are "sufficiently likely to happen to justify judicial intervention."[22] The Individual Plaintiffs, as already discussed, are also likely to suffer hardship by being denied access to the provider of their

---

[18] *Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 838 (5th Cir. 2003).

[19] *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

[20] *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987).

[21] (emphasis added).

[22] *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993)).

14

choice under 42 U.S.C. § 1396a(a)(23) and to medical services at PPGC's facilities. The Individual Plaintiffs' claims are ripe.

## PRELIMINARY INJUNCTION

Concluding that the Individual Plaintiffs have standing to bring their claims and that such claims are ripe for review, we turn to LDHH's challenge to the district court's entry of a preliminary injunction.

A plaintiff seeking a preliminary injunction must clearly show

(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[23]

We "review the district court's determination on each of these elements for clear error, its conclusions of law de novo, and the ultimate decision whether to grant relief for abuse of discretion."[24]

The district court entered a preliminary injunction on the basis of the Individual Plaintiffs' claims that LDHH's termination of PPGC's Medicaid provider agreements violates their free-choice-of-provider rights under 42 U.S.C. § 1396a(a)(23). LDHH raises multiple challenges to the grant of the preliminary injunction. First, it insists that the district court erred in holding that the Individual Plaintiffs claims are substantially likely to succeed because (1) 42 U.S.C. § 1396a(a)(23) does not afford the Individual Plaintiffs a private right of action, and, in the alternative, (2) its termination action does not violate the Individual Plaintiffs' free-choice-of-provider rights. Second, LDHH

---

[23] *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)).

[24] *Id.* (citing *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009)).

contends that the district court committed clear error in holding that the remaining factors—irreparable injury to the plaintiffs, balancing of the injury to the plaintiffs versus the harm to the defendant, and the public interest—weigh in favor of issuing the preliminary injunction.

## A. Substantial Likelihood of Success

We first address whether 42 U.S.C. § 1396a(a)(23) affords the Individual Plaintiffs a private right of action and, if so, whether the Individual Plaintiffs are substantially likely to succeed in their claim that LDHH's termination of PPGC's provider agreements runs afoul of that right.

### 1. Private Right of Action

Joining every other circuit that has addressed this issue, we conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983. Medicaid is a cooperative program between the federal government and the states under which the federal government gives financial assistance to states to provide medical services to Medicaid-eligible individuals. The federal government and participating states share the costs of Medicaid.[25] "In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services."[26] This means that states "must comply with federal criteria governing matters such as who receives care and what services are provided at what cost."[27] In other words, "Medicaid offers the States a bargain: Congress provided federal

---

[25] *Atkins v. Rivera*, 477 U.S. 154, 156–57 (1986) ("The Federal Government shares the costs of Medicaid with States that elect to participate in the program.").

[26] *Id.* at 157 (citing 42 U.S.C. § 1396a; *Schweiker v. Gray Panthers*, 453 U.S. 34, 36–37 (1981)).

[27] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012).

No. 15-30987

funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions."[28]

This appeal concerns the contours of the federal Medicaid statute's free-choice-of-provider requirement, 42 U.S.C. § 1396a(a)(23). That provision mandates that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."[29] Discussing this provision in *O'Bannon v. Town Court Nursing Center*, the Supreme Court explained that it "gives recipients the right to choose among a range of *qualified* providers, without government interference."[30] Most recently, the Ninth Circuit explained that "[t]he provision specifies that any individual Medicaid recipient is free to choose any provider so long as two criteria are met: (1) the provider is 'qualified to perform the service or services required,' and (2) the provider 'undertakes to provide [the recipient] such services.'"[31]

Because the Individual Plaintiffs assert their claims under 42 U.S.C. § 1983, we analyze whether § 1396a(a)(23) creates a right of action under that statute. Title 42 U.S.C. § 1983 "provides redress only for a plaintiff who asserts a 'violation of a federal *right*, not merely a violation of federal *law*.'"[32] To determine whether a federal statute provides a right of action enforceable under § 1983, we must determine "(1) whether Congress intended for the

---

[28] *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015) (Scalia, J.) (plurality opinion).

[29] 42 U.S.C. § 1396a(a)(23)(A).

[30] 447 U.S. 773, 785 (1980) (emphasis in original).

[31] *Planned Parenthood of Ariz. Inc. v. Betlach*, 727 F.3d 960, 967 (9th Cir. 2013) (second alteration in original) (quoting 42 U.S.C. § 1396a(a)(23)(A)).

[32] *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602 (5th Cir. 2004) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in original)).

No. 15-30987

provision to benefit the plaintiff; (2) whether the plaintiff can show that the right in question is not so 'vague and amorphous' that its enforcement would 'strain judicial competence'; and (3) whether the statute unambiguously imposes a binding obligation on the states."[33]

Every circuit court to have addressed this issue, as well as multiple district courts, has concluded that § 1396a(a)(23) creates a private right enforceable under § 1983.[34] The Ninth Circuit in *Planned Parenthood Arizona Inc. v. Betlach* addressed this question most recently. As to the first element, that court held:

> The statutory language unambiguously confers [an individual] right upon Medicaid-eligible patients, mandating that all state Medicaid plans provide that '*any individual* eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required.'[35]

As to the second element, the court held that "[t]he free-choice-of-provider requirement does 'supply concrete and objective standards for enforcement,'"[36] which are "well within judicial competence to apply."[37] It recognized that under the statute, Medicaid recipients have the right to choose any provider so long as "(1) the provider is 'qualified to perform service or services required,' and (2) the provider 'undertakes to provide [the recipient] such services.'"[38] According

---

[33] *Id.*

[34] *See Planned Parenthood of Ariz.*, 727 F.3d 960; *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006); *Planned Parenthood of Kan. & Mid-Mo. v. Mosier*, No. 16-2284-JAR-GLR, 2016 WL 3597457 (D. Kan. July 5, 2016); *Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207 (M.D. Ala. 2015); *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 4:15-cv-566, slip op. (E.D. Ark. Oct. 2, 2015); *Women's Hosp. Found. v. Townsend*, No. 07-711, 2008 WL 2743284 (M.D. La. July 10, 2008).

[35] 727 F.3d at 966 (quoting 42 U.S.C. § 1396a(a)(23)(A)).

[36] *Id.* at 967 (quoting *Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006)).

[37] *Id.*

[38] *Id.* (alteration in original) (quoting 42 U.S.C. § 1396a(a)(23)(A)).

No. 15-30987

to the Ninth Circuit, courts addressing this provision confront "a simple factual question no different from those courts decide every day," and free from "any balancing of competing concerns or subjective policy judgments."[39]

In so holding, the Ninth Circuit rejected Arizona's contention that "qualified," as used in 42 U.S.C. § 1396a(a)(23)(A), is too vague to enforce. Because the term "is tethered to an objective benchmark"—"qualified *to perform the service or services required*"—"[a] court can readily determine whether a particular health care provider is qualified to perform a particular medical service, drawing on evidence such as descriptions of the service required; state licensing requirements; the provider's credentials, licenses, and experience; and the expert testimony regarding the appropriate credentials for providing the service."[40]

The Seventh Circuit reached the same conclusion in *Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State Department of Health*.[41] As to the third element—which the Ninth Circuit did not discuss at length because Arizona had not challenged that point—the Seventh Circuit held that the free-choice-of-provider requirement is couched in mandatory terms: "[T]he free-choice-of-provider statute explicitly refers to a specific class of people— Medicaid-eligible patients—and confers on them an individual entitlement— the right to receive reimbursable medical services from any qualified provider."[42] Likewise, the Sixth Circuit in *Harris v. Olszewski*[43] held that the free-choice-of-provider requirement provides a private right of action enforceable under § 1983.

---

[39] *Id.*
[40] *Id.* at 967–68.
[41] 699 F.3d 962 (2012).
[42] *Id.* at 974.
[43] 442 F.3d 456 (2006).

19

No. 15-30987

We agree with the Sixth, Seventh, and Ninth Circuits and hold that 42 U.S.C. § 1396a(a)(23) creates a private right of action that these Individual Plaintiffs can enforce through 42 U.S.C. § 1983. LDHH's remaining arguments fail to convince us otherwise.

LDHH and our dissenter rely on the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center*[44] for the proposition that the Individual Plaintiffs have no right to challenge LDHH's provider-qualifications determination. That case is inapposite. There, the patient-plaintiffs' injuries were alleged to stem from a deprivation of due process rights, specifically, the right to a hearing to contest the state's decertification of a health care provider, not just its Medicaid qualification.[45] Specifically, the nursing home in question was found to not comply with statutes governing: (1) body and management, (2) medical direction, (3) physical services, (4) nursing services, (5) pharmaceutical services, (6) medical records, and (7) physical environment.[46] In contrast, the Individual Plaintiffs here assert the violation of a substantive right.[47] The Supreme Court's holding in *O'Bannon* that "while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified,"[48] is thus not applicable here.

---

[44] 447 U.S. 773 (1980).

[45] *Id.* at 776 n.3.

[46] *Id.*

[47] *See Planned Parenthood of Ind.*, 699 F.3d at 977 (distinguishing *O'Bannon* on the same basis). LDHH also relies on *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170 (2d Cir. 1991), but that case is distinguishable for the same reason as *O'Bannon*. *See Planned Parenthood of Ind.*, 699 F.3d at 977 (distinguishing *Kelly Kare* on the same basis).

[48] 447 U.S. at 786.

No. 15-30987

The statute speaks only in terms of recipients' rights rather than providers' rights, so the right guaranteed by § 1396a(a)(23) is vested in Medicaid recipients rather than providers. Providers like PPGC cannot bring a challenge pursuant to § 1396a(a)(23).[49] Reading *O'Bannon* to foreclose *every recipient's* right to challenge a disqualification decision would render the right guaranteed by § 1396a(a)(23) nugatory.

Notably, the Court decided *O'Bannon* in the context of a state's enforcement action. In that case, Pennsylvania had decertified Town Court Nursing Center ("Town Court") because "it no longer met the statutory and regulatory standards for skilled nursing facilities."[50] Three days later, Pennsylvania terminated the Medicaid provider agreement with Town Court.[51] The Supreme Court held:

> When *enforcement of [minimum standards of care] requires decertification of a facility*, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.[52]

In other words, the plaintiffs had no right to reside in an unqualified facility *when the disqualification decision was connected to the state's enforcement of*

---

[49] *See* § 1396a(a)(23) (requiring state plans provide that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services"); *cf. Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990) (finding that provision requiring states to reimburse providers at reasonable and adequate rates gave providers an enforceable right under the Medicaid law). Providers might have an administrative remedy in state court—as PPGC did in this case—but "[t]he availability of state administrative procedures ordinarily does not foreclose resort to § 1983." *Id.* at 523.

[50] *O'Bannon*, 447 U.S. at 775–76.

[51] *Id.* at 776.

[52] *Id.* at 787 (emphasis added); *see also id.* at 790 (concluding that "the enforcement by [Pennsylvania] of [its] valid regulations did not directly affect the patients' legal rights or deprive them of any constitutionally protected interest in life, liberty, or property").

21

*its health and safety regulations.*[53] This makes sense: If it were otherwise, patients could freely intervene in state enforcement actions against facilities that violate health and safety standards.

This case is different. Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license. Instead, Louisiana terminated only PPGC's Medicaid provider agreement. The Individual Plaintiffs in this case are not challenging "the merits of the decertification decision," as did the plaintiffs in *O'Bannon*, because here there was no decertification decision. When, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite. The Individual Plaintiffs in this case are trying to sustain their "right to choose among a range of *qualified* providers, without government interference"—a right explicitly recognized in *O'Bannon*.[54]

LDHH's reliance on the recent Supreme Court opinion, *Armstrong v. Exceptional Child Center, Inc.*,[55] is equally misplaced. There, the relevant issue was whether 42 U.S.C. § 1396a(a)(30)(A)—not § 1396a(a)(23) —creates a private right of action.[56] Writing for a plurality, Justice Scalia noted that this

---

[53] *See Kelly Kare*, 930 F.2d at 178 ("In *O'Bannon*, the Supreme Court held that Medicaid-eligible nursing home patients did not have a vested right to choose a nursing home *that was being decertified as a health-care provider.*" (emphasis added)).

[54] 447 U.S. at 785 (emphasis in original).

[55] 135 S. Ct. 1378 (2015).

[56] That provision of the Medicaid statute requires state plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are

provision "lacks the sort of rights-creating language needed to imply a private right of action," because it "is phrased as a directive to the federal agency . . . , not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid."[57] Justice Scalia also observed that § 1396a(a)(30)(A) was "judicially unadministrable": "It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'"[58] In contrast, § 1396a(a)(23)—the provision at issue here—is phrased in individual terms that are specific and judicially administrable, as recognized by the Sixth, Seventh, and Ninth Circuits.

LDHH finally insists that § 1396a(a)(23) provides Medicaid recipients with only the right to choose a qualified provider, not the right to choose a provider that LDHH has deemed unqualified. Understandably, LDHH does not take the next inferential step, but it follows that the free-choice-of-provider requirement gives individuals the right to demand care from a qualified provider when access to that provider is foreclosed by reasons *unrelated* to that provider's qualifications. Otherwise, any right to which the Individual Plaintiffs are entitled to under § 1396a(a)(23) would be hollow.[59] Importantly, the Individual Plaintiffs insist that LDHH has deprived them of their choice to receive care from PPGC—a provider that LDHH has conceded is competent to

---

available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]" 42 U.S.C. § 1396a(a)(30)(A).

[57] *Armstrong*, 135 S. Ct. at 1387.

[58] *Id.* at 1385 (alteration and omission in original).

[59] *See Planned Parenthood Se.*, 141 F. Supp. 3d at 1218 ("If [it] were correct that allegedly unlawful terminations of provider agreements could not be challenged by recipients pursuant to the free-choice-of-provider provision, that provision's '*individual* entitlement,' the 'personal right' it gives recipients, would be an empty one." (quoting *Planned Parenthood of Ind.*, 699 F.3d at 974)).

render the relevant medical services—for reasons *unrelated to its competence.* The operative issue, therefore, is resolved by determining whether LDHH terminated PPGC's Medicaid provider agreements based on its qualifications or based on some unrelated reason.

### 2. Likelihood of Success

Having concluded that § 1396a(a)(23) affords the Individual Plaintiffs a right of action, we next ask whether they are likely to substantially succeed on their claim that LDHH's termination of PPGC's Medicaid provider agreements violates their rights under § 1396a(a)(23).

*a. Statutory Background*

The free-choice-of-provider requirement mandates that a state's Medicaid plan must allow beneficiaries to obtain medical care from *any* entity or person who is "qualified to perform the service or services required" and "who undertakes to provide him such services."[60] Medicaid regulations allow states to set "reasonable standards relating to the qualifications of providers."[61] The Medicaid statute does not define the term "qualified," but LDHH concedes that, as held by the Seventh and Ninth Circuits, "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner."[62] Separately, Medicaid's exclusion provision, 42 U.S.C. § 1396a(p)(1), provides, "[i]n addition to any other authority," mandatory and permissive

---

[60] 42 U.S.C. § 1396a(a)(23)(A).

[61] 42 C.F.R. § 431.51(c)(2).

[62] *Planned Parenthood of Ind.*, 699 F.3d at 978; *see also Planned Parenthood of Ariz.*, 727 F.3d at 969 ("We agree with the Seventh Circuit that '[r]ead in context, the term 'qualified' as used in § 1396a(a)(23) unambiguously relates to a provider's . . . capab[ility] of performing the needed medical services in a professionally competent, safe, legal, and ethical manner.'" (alterations and omissions in original) (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978)).

grounds—including fraud, drug crimes, and failure to disclose necessary information to regulators—under which a state may terminate a provider's Medicaid agreements. That provision's implementing regulation states that "[n]othing contained in this part should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law."[63]

Against this backdrop, the Seventh Circuit, in *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, upheld a district court's entry of a preliminary injunction that prevented Indiana from enforcing a law that "excludes a class of providers from Medicaid for reasons unrelated to provider qualifications" because Planned Parenthood was likely to succeed on its claim that the law violated 42 U.S.C. § 1396a(a)(23).[64] The law at issue prohibited state agencies from providing state or federal funds to "any entity that performs abortions or maintains or operates a facility where abortions are performed."[65] The Seventh Circuit recognized that "[a]lthough Indiana has broad authority to exclude unqualified providers from its Medicaid program, the State does not have plenary authority to exclude a class of providers for *any* reason—more importantly, for a reason unrelated to provider qualifications."[66] Because the law "exclude[d] Planned Parenthood from Medicaid for a reason unrelated to its fitness to provide medical services, [it] violat[ed] its patients' statutory right to obtain medical care from the qualified provider of their choice."[67]

---

[63] 42 C.F.R. § 1002.2.

[64] *Planned Parenthood of Ind.*, 699 F.3d at 980.

[65] *Id.* at 967 (quoting Ind. Code § 5-22-17-5.5(b)).

[66] *Id.* at 968.

[67] *Id.*

No. 15-30987

The Ninth Circuit addressed a similar law in *Planned Parenthood Arizona Inc. v. Betlach.*[68] That court held that the "law violates [the free-choice-of-provider] requirement by precluding Medicaid patients from using medical providers concededly qualified to perform family planning services to patients in Arizona generally, solely on the basis that those providers separately perform privately funded, legal abortions."[69] In doing so, the Ninth Circuit rejected Arizona's contention that it "can determine for any reason that a provider is not qualified for Medicaid purposes, even if the provider *is* otherwise legally qualified, through training and licensure, to provide the requisite medical services within the state."[70] That court gave four reasons, each of which we view as applicable here.

First, "[n]owhere in the Medicaid Act has Congress given a special definition to 'qualified,' much less indicated that each state is free to define this term for purposes of its own Medicaid program however it sees fit."[71] Second, that reading would "detach[] the word 'qualified' from the phrase in which it is embedded; 'qualified to perform the service or services rendered' (and from the overall context of the Medicaid statute, which governs *medical* services)."[72] Third, that reading would render the free-choice-of-provider requirement "self-eviscerating" because "[i]f states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by

---

[68] The law at issue provided: "[Arizona] or any political subdivision of [Arizona] may not enter into a contract with or make a grant to any person that performs nonfederally qualified abortions or maintains or operates a facility where nonfederally qualified abortions are performed for the provision of family planning services." 2012 Ariz. Leg. Serv. Ch. 288 (H.B. 2800) (West) (codified at Ariz. Rev. Stat. § 35-196.05(B)).

[69] *Planned Parenthood Ariz.*, 727 F.3d at 963.

[70] *Id.* at 970 (emphasis in original).

[71] *Id.*

[72] *Id.* (emphasis in original).

simply labeling any exclusionary rule as a 'qualification.'"[73] "Giving the word 'qualified' such an expansive meaning would deprive the provision within which it appears of any legal force," and "would permit states freely to erect barriers to Medicaid patients' access to family planning medical providers others in the state are free to use."[74] This "would eliminate 'the broad access to medical care that § 1396a(a)(23) is meant to preserve.'"[75] Finally, "permit[ting] states self-referentially to impose for Medicaid purposes whatever standards for provider participation it wishes" would contravene the "*mandatory* requirements [in the free-choice-of-provider provision] that apply to all state Medicaid plans."[76]

The Seventh and Ninth Circuits have also addressed the impact of Medicaid's exclusion provision, 42 U.S.C. § 1396a(p). LDHH seems to rely on 42 U.S.C. § 1396a(p)(1) for only its introductory phrase: "In addition to any other authority." Like Arizona and Indiana, LDHH contends that this phrase allows a state to exclude a provider for "any" reason supplied by state law. The Seventh and Ninth Circuits flatly rejected that same contention.[77]

In doing so, the Seventh Circuit explained that this argument "reads the phrase for more than it's worth."[78] The phrase—"[i]n addition to any other authority"—"signals only that what follows is a non-exclusive list of specific

---

[73] *Id.* (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978).

[74] *Id.*

[75] *Id.* (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978).

[76] *Id.* at 971 (emphasis in original).

[77] The First Circuit in *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46 (1st Cir. 2007), however, read 42 U.S.C. § 1396a(p)(1)'s "[i]n addition to any other authority" language much more broadly. That court held that the "'any other authority' language was intended to permit a state to exclude an entity from its Medicaid program for *any* reason established by state law." *Id.* at 53. That case is distinguishable because it did not involve § 1396a(a)(23)'s free-choice-of-provider requirement, most notably because § 1396a(a)(23) does not apply in Puerto Rico, the forum from which the dispute arose in *Vega-Ramos*.

[78] *Planned Parenthood of Ind.*, 699 F.3d at 979.

grounds upon which states may bar providers from participating in Medicaid."[79] "It does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever."[80]

The Ninth Circuit adopted the Seventh Circuit's reasoning and further explained why this assertion "undermines, rather than aids, [the state's] argument":

> The language refers to "any *other* authority" . . . , followed by a provision providing states with authority to exclude providers on specified grounds. This sequence indicates that the Medicaid Act itself must provide that "other" authority, just as it supplies the "authority" covered by the rest of the subsection. Were it otherwise—were states free to exclude providers as they see fit— then the bulk of § 1396a(p)(1) itself would be unnecessary, as the "authority" it supplies would be superfluous.[81]

According to the Ninth Circuit, this "clause empowers states to exclude individual providers on such grounds directly, without waiting for the Secretary to act, while also reaffirming state authority to exclude individual providers pursuant to analogous state law provisions relating to fraud or misconduct."[82] As to § 1396a(p)'s implementing regulation, 42 C.F.R. § 1002.2, which provides that "[n]othing contained in this part should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law," the Ninth Circuit noted that "[t]hat provision is only a limitation on interpretation of the referenced 'part' of the regulations . . . which does not encompass the free-choice-of-provider requirement."[83]

---

[79] *Id.*

[80] *Id.*

[81] *Planned Parenthood of Ariz.*, 727 F.3d at 972.

[82] *Id.*

[83] *Id.* at 972 n.8; *accord Planned Parenthood of Se.*, 141 F. Supp. 3d at 1221.

While as a general rule a state may terminate a provider's Medicaid agreements for reasons bearing on that provider's general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider's authorization to offer those same services to non-Medicaid patients. "Qualified" means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner."[84] States may also exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(1) and on analogous state law grounds relating to a provider's qualification. Although states retain broad authority to define provider qualifications and to exclude providers on that basis, their authority is circumscribed by the meaning of "qualified" in this context.

*b. Analysis*

LDHH insists that its termination of PPGC's Medicaid qualifications do not violate the Individual Plaintiffs' free-choice-of-provider rights because LDHH has determined that PPGC is not "qualified" to render medical services to Medicaid patients. As noted, LDHH offers three grounds for its terminations: (1) two qui tam FCA claims, one that PPGC settled, disclaiming all liability, and another that was pending at the time of LDHH's termination action, but that has recently settled with PPGC disclaiming all liability; (2) unspecified misrepresentations in PPGC's letters responding to LDHH's inquiry into whether PPGC or PPCFC operate a fetal tissue donation program; and (3) LDHH's and the Louisiana Office of Inspector General's pending investigations into PPGC. But, none of these three grounds is directed at PPGC's qualification to render medical services to Medicaid patients.

---

[84] *Planned Parenthood of Ind.*, 699 F.3d at 978.

We agree with the district court that the Individual Plaintiffs are substantially likely to succeed in proving that LDHH's termination of PPGC's Medicaid provider agreements violates their free-choice-of-provider rights. This is because LDHH's grounds for termination (1) do not relate to PPGC's "qualifications," (2) are not authorized by § 1396a(p), and (3), with one exception, are not even authorized by state law.

We observe initially that LDHH does not even attempt to articulate how its grounds for termination relate to PPGC's qualifications. That failure is exacerbated by the fact that LDHH has separately conceded that PPGC is competent to provide the relevant medical services. LDHH adopts the Seventh and Ninth Circuits definition of "qualified" and contends that its grounds for termination fall within the statute's broad meaning of "qualified." But LDHH makes no attempt to reconcile its grounds for termination with its borrowed definition of "qualified." Its briefing is devoid of argument on this point, and LDHH's grounds for termination do not speak for themselves. LDHH cannot show that PPGC's settlement of qui tam FCA claims, in which it *disclaimed all liability*, constitutes actual fraud or renders PPGC unqualified in some other way. Neither does LDHH explain how unspecified misrepresentations related to a program, the existence of which PPGC unequivocally denies, render PPGC unqualified. Likewise, that PPGC is the subject of an investigation does not alone render PPGC unqualified. Importantly, LDHH raises no separate concerns regarding PPGC's provision of medical services in Louisiana. Indeed, it bears repeating that LDHH has conceded that PPGC is competent to provide the relevant medical services to any and all non-Medicaid patients.

Instead of attempting to show that PPGC is not "qualified" under § 1396a(a)(23), LDHH seems to rely on its bald assertion that it may terminate a provider for *any reason* supplied by state law. In other words, LDHH argues

that PPGC is unqualified simply because state law says so. The fallacy of this circular tactic is underscored by LDHH's failure to articulate or apply any limiting principle to its authority to exclude any Medicaid provider. We reject that argument because, as explained by the Ninth Circuit, a state cannot "determine for any reason that a provider is not qualified for Medicaid purposes, even if the provider *is* otherwise legally qualified, through training and licensure, to provide the requisite medical services within the state."[85]

Neither does LDHH even assert that its grounds for termination are consistent or analogous with 42 U.S.C. § 1396a(p)(1)'s enumerated grounds for exclusion. LDHH might have attempted to make some argument as to this point, but it has not invoked any of the grounds for termination provided by § 1396a(p)(1). This is likely because, as the United States's amicus curiae brief explains, LDHH's grounds for termination are not authorized by any of the grounds enumerated in § 1396a(p)(1). And, to the extent LDHH relies on that provision's "[i]n addition to any other authority" language, we join the Seventh and Ninth Circuits in rejecting such an overbroad interpretation.

Finally, two of LDHH's grounds for termination—fraud and misrepresentations by PPGC—are not even supported by the state laws it invokes. LDHH labels its first ground for termination as "fraud," citing two FCA suits filed against PPGC by qui tam plaintiffs. As to the first suit, LDHH asserts that it may exclude PPGC for (1) settling a qui tam FCA suit, and (2) failing to notify LDHH of the settlement. We have noted that, in *Reynolds v. Planned Parenthood of Gulf Coast, Inc.*, PPGC settled a qui tam FCA suit *while denying all liability*. Louisiana Administrative Code Title 50 § 4147(A)(12) states that a Medicaid provider may be terminated for "entering into a

---

[85] *Planned Parenthood of Ariz.*, 727 F.3d at 970 (emphasis in original).

No. 15-30987

settlement agreement under . . . the Federal False Claims Act," and further places an "affirmative duty" on a provider to inform LDHH in writing of any violations. But, that same statute states that "[i]f a False Claims Act action or other similar civil action is brought by a Qui-Tam plaintiff, no violation of this provision has occurred until the defendant has been found liable in the action."[86] Because PPGC settled the *Reynolds* qui tam FCA claim without admitting liability, that settlement cannot provide the basis for applying the subject statute.

LDHH next cites another qui tam FCA case against PPGC, *Carroll v. Planned Parenthood Gulf Coast*. At the time of the district court's opinion and the parties' briefing, that case was still pending and the trial court had denied PPGC's motion to dismiss. LDHH argued that this lawsuit creates a violation of Title 50 of the Louisiana Administrative Code because providers

> "are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact."

In so arguing, LDHH failed to demonstrate how the district court's denial of a motion to dismiss in a pending lawsuit indicates that PPGC had violated any laws or Medicaid program requirements. More significantly, on May 25, 2016, PPGC filed a Rule 28(j) letter with this court, informing us that PPGC had settled that suit as of February 29, 2016, *without admitting liability*. Accordingly, the *Carroll* case provides no basis for termination.

LDHH's asserted termination on the basis of "misrepresentations" suffers from similar flaws. Louisiana Revised Statute § 46:437.14(A)(1) states

---

[86] LA. ADMIN CODE tit. 50 § 4147(A)(12)(c).

that a provider's enrollment may be revoked for a "[m]isrepresentation."[87] That statute separately defines "misrepresentation" to mean "the knowing failure to truthfully or fully disclose any and all information required, or the concealment of any and all information required on a claim or a provider agreement or the making of a false or misleading statement to the department *relative to the medical assistance programs.*"[88]

LDHH posits that PPGC made misrepresentations in responding to questions about whether it operates a fetal tissue donation program, as evidenced by one of the discussed videos, which serves as LDHH's sole basis for application of La. R.S. § 46:437.14(A)(1) and PPGC's termination. Neither in the letters nor at any time during this litigation has LDHH identified a single misrepresentation. Moreover, the undisputed evidence establishes that PPGC does not perform any abortions or operate any fetal tissue donation programs.[89] The district court found that the undisputed evidence revealed no indication that PPGC had made any misrepresentations, and LDHH does not even challenge that factual finding on appeal. LDHH's only response is that its

---

[87] This provision is part of Louisiana's Medical Assistance Programs Integrity Law, La. R.S. § 437.1 *et seq.*, which was "enacted to combat and prevent fraud and abuse committed by some health care providers participating in the medical assistance programs and by other persons and to negate the adverse effects such activities have on fiscal and programmatic integrity." La. R.S. § 437.2(A). More specifically, the Louisiana legislature sought to provide a remedy against "health care providers and other persons who engage in fraud, misrepresentation, abuse, or other ill practices . . . *to obtain payments* to which these health care providers or persons are not entitled." La. R.S. § 437.2(B) (emphasis added).

[88] La. R.S. § 46:437.3(15) (emphasis added); *see also Caldwell v. Janssen Pharm., Inc.*, 144 So. 3d 898, 911 (La. 2014) ("[W]e determine that a 'misrepresentation' under La. Rev. Stat. 46:437.3(15) is (1) the knowing failure to truthfully or full disclose any information required on a claim or provider agreement; (2) the concealment of any and all information required on a claim or provider agreement; or (3) the making of a false or misleading statement to the department relative to the medical assistance programs.").

[89] PPGC's August 14, 2015 letter states: "To be very clear, there is no contradiction here. As already stated, neither PPCFC nor PPGC currently has a fetal tissue donation program in Texas, and neither sells nor donates any fetal tissue."

lack of specificity regarding the misrepresentations "should be addressed at an administrative hearing." LDHH's strategy to terminate PPGC's provider agreements for misrepresentations *before* it can even identify a single misrepresentation does not pass muster.

Additionally, the statute cited by LDHH requires the misrepresentation to be made "relative to the medical assistance programs."[90] Because the undisputed evidence establishes that PPGC does not provide abortions or operate a fetal tissue donation program in Louisiana (or elsewhere), any statements contained in PPGC's response to the state's inquiry are likely not "relative to" Louisiana's Medicaid program. This conclusion is bolstered by LDHH's August 4, 2015 letter that cites two statements made in relation to PPCFC, a separate Texas corporation, not to PPGC, as contradicting statements made in one of the videos.[91] LDHH provides no explanation of how the unspecified misrepresentations are "relative to" Louisiana's Medicaid program.[92] For this reason alone, the statute is inapplicable.

As to LDHH's final ground for termination—pending investigations—Louisiana Revised Statute § 46:437.11(D)(2) states that the "secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding." That provision appears to be facially applicable to PPGC as it is the subject of ongoing investigations. Regardless, we cannot reconcile the free-choice-of-provider requirement's mandate with a state law that would enable LDHH to terminate a Medicaid provider agreement by

---

[90] La. R.S. § 46:437.3(15).

[91] In the August 4, 2015, letter, LDHH recites two responses PPGC made in relation to *only* PPCFC's operations. It then states that those responses were contradicted by one of the Center for Medical Progress's videos made on April 9, 2015.

[92] Had LDHH come forward with evidence of PPGC's misrepresentations, it is possible LDHH would have had a valid reason for terminating PPGC as a Medicaid provider.

simply instigating an investigation, much less on the basis of just *any* pending investigation. If states were able to exclude Medicaid providers on the basis of *any* investigation, § 1396a(a)(23)'s guarantee would be meaningless. And here, the investigations pertain to conduct that, as described, does not independently provide grounds for termination.

### c. *Limits of Our Opinion*

In concluding that the Individual Plaintiffs are likely to succeed in proving that LDHH's termination of PPGC's provider agreements violates their § 1396a(a)(23) rights, we reiterate for emphasis the unique circumstances of the instant case. LDHH initially purported to terminate PPGC's agreements "at will," *i.e.*, for no reason at all. That termination would plainly have run afoul of § 1396a(a)(23)'s guarantee. Despite LDHH's categorization of its termination as "at will," then-Governor Jindal released a contemporaneous statement indicating that the state was terminating PPGC's agreements "because Planned Parenthood does not represent the values of the State of Louisiana in regards to respecting human life." Again, that termination would violate the Individual Plaintiffs' § 1396a(a)(23) rights because, as the Seventh and Ninth Circuits have held, a state may not exclude a provider simply based on the scope of the services it provides.

Only after the Plaintiffs filed suit to challenge that termination did LDHH rescind its "at will" terminations and represent to the district court that it believed the Plaintiffs' claims were moot. But, as noted above, LDHH's gamesmanship was not over: The very next day, it issued new termination letters to PPGC, which provided new grounds for termination. LDHH has effectively run circles around PPGC and the district court. This course of conduct further convinces us that LDHH's termination of PPGC's Medicaid provider agreements has nothing to do with PPGC's qualifications.

No. 15-30987

To be sure, the general grounds for termination invoked by LDHH—fraud, misrepresentations, and investigations—might well relate to a provider's qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance. Medicaid's 42 U.S.C. § 1396a(p)(1)'s exclusionary provision makes that clear. And, there is no dispute that Louisiana retains authority to establish licensing standards and other qualifications for providers.[93] Title 42 U.S.C. § 1320a-7(b)(4) expressly contemplates that a state licensing authority may revoke a provider's license "for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity," and that the Secretary may exclude such a provider from any federal health care program under that provision. Hence, 42 U.S.C. § 1396a(p)(1), which cross references § 1320a-7(b)(4), necessarily authorizes states to terminate a Medicaid provider's agreements when that state revokes that provider's license "for reasons bearing on the [provider's] professional competence, professional performance, or financial integrity." It bears repeating, however, that LDHH has taken *no action* to revoke PPGC's license and has not called into question any qualification that enables PPGC to offer medical care generally.

At the most, LDHH has simply pasted the labels of "fraud" and "misrepresentations" on PPGC's conduct, and then insisted that alone these content-less labels somehow insulate its termination actions from any § 1396a(a)(23) challenges. LDHH is seeking to do exactly what the Seventh and Ninth Circuits warned against: "simply labeling any exclusionary rule as a

---

[93] *See Planned Parenthood of Ind.*, 699 F.3d at 980 ("No one disputes that the states retain considerable authority to establish licensing standards and other related practice qualifications for providers—this residual power is inherent in the cooperative-federalism model of the Medicaid program and expressly recognized in the Medicaid regulations.").

'qualification'" to evade the mandate of the free-choice-of-provider requirement.[94] PPGC's settlement of qui tam FCA claims *without admitting liability* does not constitute fraud under any definition of that term. And LDHH's accusation that PPGC made misrepresentations related to inquiries into whether it operates a fetal tissue donation program is devoid of any factual support or linkage. Neither can LDHH's labeling of its grounds for termination as fraud and misrepresentations insulate its actions from a § 1396a(a)(23) challenge. If it were otherwise, states could terminate Medicaid providers with impunity and avoid § 1396a(a)(23)'s mandate altogether.

We repeat yet again for emphasis that LDHH has never once complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license. As a result, LDHH's termination of PPGC's Medicaid provider agreements would produce precisely the anomalous result that the free-choice-of-provider provision is meant to avoid, *viz.*, LDHH would deny PPGC's services only to Medicaid recipients while leaving all other individuals free to obtain the very same services from PPGC. But, "the free-choice-of-provider provision unambiguously requires that states participating in the Medicaid program allow covered patients to choose among the family planning medical practitioners they could use were they paying out of their own pockets."[95]

In sum, we conclude that the Individual Plaintiffs are substantially likely to succeed in showing that LDHH's termination of PPGC's provider agreements violates their rights under § 1396a(a)(23). This is because LDHH

---

[94] *Id.* at 978; *Planned Parenthood of Ariz.*, 727 F.3d at 970.

[95] *Planned Parenthood of Ariz.*, 727 F.3d at 971.

seeks to terminate PPGC's Medicaid provider agreements for reasons unrelated to its qualifications.

## B. Remaining Factors

Finally, we turn to the other issues weighed by the district court: irreparable injury; harm to the enjoined party; public interest.

As to whether the Individual Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction, LDHH first contends that because § 1396a(a)(23) guarantees the Individual Plaintiffs the right to choose only a *qualified* provider, they will suffer no harm because PPGC is not qualified. We have already rejected that obviously flawed circular argument.

LDHH next asserts that irreparable injury may not be presumed from a statutory violation, and the Individual Plaintiffs' legal injury is not sufficiently concrete, great, and imminent to constitute irreparable harm. LDHH further contends that any inconvenience the Individual Plaintiffs sustain by being forced to seek medical care elsewhere is not significant enough to support a finding of irreparable harm.

The district court determined that the Individual Plaintiffs would suffer irreparable injury because they will not be able to obtain medical care from the Medicaid provider of their choice. The court relied on "uncontroverted" declarations, in which the Individual Plaintiffs state that they wish to continue receiving care at PPGC and that they do not know where else they could get the same kind and quality of care. The court further emphasized that even if the Individual Plaintiffs could find medical care elsewhere, this is beside the point: The Individual Plaintiffs would still be denied the provider of their choice, a right guaranteed under 42 U.S.C § 1396a(a)(23).

The Seventh Circuit squarely addressed this issue, rejecting an identical argument from the state:

Indiana maintains that any harm to [the] patients is superficial because they have many other qualified Medicaid providers to choose from in every part of the state. This argument misses the mark. That a range of qualified providers remains available is beside the point. Section 1396a(a)(23) gives Medicaid patients the right to receive medical assistance from the provider of their choice without state interference, save on matters of qualifications.[96]

The Ninth Circuit has also stated that "[t]here is no exception to the free-choice-of-provider requirement for 'incidental' burdens on patient choice."[97] Separately, that circuit has "several times held that beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care."[98]

We are satisfied that the district court did not clearly err in holding that the Individual Plaintiffs will suffer irreparable harm, absent entry of a preliminary injunction, while this case plays out. Because the Individual Plaintiffs would otherwise be denied both access to a much needed medical provider and the legal right to the qualified provider of their choice, we agree that they would almost certainly suffer irreparable harm in the absence of a preliminary injunction.

LDHH next urges that its substantial interest in administering its Medicaid program—overseeing the expenditures of the state's Medicaid funds and ensuring that Medicaid providers are complying with applicable laws and regulations—outweighs any injury to the Individual Plaintiffs, which it construes as "the mere inconvenience . . . of having longer wait times or longer lead times for appointments for family planning services." The district court

---

[96] *Planned Parenthood of Ind.*, 699 F.3d at 981.

[97] *Planned Parenthood of Ariz.*, 727 F.3d at 975.

[98] *M.R. v. Dreyfus*, 697 F.3d 706, 732 (9th Cir. 2011) (internal quotation marks omitted).

rejected this rationale, holding that LDHH will not be deprived of its ability to administer Louisiana's Medicaid program. Rather, the injunction relates only to LDHH's attempt to terminate a single provider. The district court also held that any interest of the state is outweighed by the harm the Individual Plaintiffs will suffer.

The district court did not commit clear error in concluding that the harm to the Individual Plaintiffs will outweigh any harm inflicted on LDHH. As to its interest in administering the state's Medicaid program, LDHH can never have a legitimate interest in administering that program in a manner that violates federal law.

As to LDHH's fiscal interests, the Ninth Circuit addressed a balancing of similar interests in *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*.[99] It explained that because a "budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction," "[s]tate budgetary considerations do not therefore, in social welfare cases, constitute a critical public interest that would be injured by the grant of preliminary relief."[100] "In contrast, there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.'"[101] The Fourth Circuit has reached a similar conclusion: "Although we understand that the North Carolina legislature must make difficult decisions in an imperfect fiscal climate, the public interest in this case lies with

---

[99] 572 F.3d 644 (9th Cir. 2009), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012).

[100] *Id.* at 659.

[101] *Id.* (quoting *Schweiker v. Hogan*, 457 U.S. 569, 590 (1982) (quoting H.R. Rep. No. 89-213, at 66 (1965))).

No. 15-30987

safeguarding public health rather than with assuaging North Carolina's budgetary woes."[102]

For these reasons, we hold that the district court did not commit clear error in ruling that the harm to the Individual Plaintiffs outweighs any harm that the state might experience.

Finally, LDHH challenges the district court's determination that an injunction serves the public interest. It contends that the general public has an interest in the proper expenditure of the state's Medicaid funds, including the oversight of providers who are receiving those funds. The district court determined that the injunction serves the public interest by ensuring that Medicaid recipients have continuing access to medical care at PPGC.

Because LDHH's termination of PPGC's Medicaid provider agreements likely violates federal law, there is no legitimate public interest in allowing LDHH to complete its planned terminations of those agreements under these immediate facts. Instead, the public interest weighs in favor of preliminarily enforcing the Individual Plaintiffs' rights and thereby allowing some of the state's neediest citizens to continue receiving medical care from a medically qualified provider. We emphasize that "there is a legitimate public interest in safeguarding access to health care for those eligible for Medicaid."[103] The district court did not err in ruling that preliminarily enjoining LDHH's terminations will serve the public interest.

## C. The Dissent

We close where we began. Despite the obvious scholarship of its able author, the dissent cannot avoid the determinative distinction between this case and *O'Bannon*. There, because the state decertified the medical provider

---

[102] *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013).

[103] *Maxwell-Jolly*, 572 F.3d at 659.

totally for failure to meet statutory and regulatory requirements for certification as a skilled nursing facility, the Supreme Court held that none of its former clientele – implicitly, whether covered by Medicaid or commercial insurance – had standing to advance constitutional claims because they were only affected incidentally. Here, Louisiana did not decertify PPGC or reference failure to meet any statutory or regulatory requirements. It only prevented it from providing Medicaid funded treatment to the impoverished women of the State: The financially independent women of the State (or at least those covered by commercial health plans or their own bank accounts) can continue to be fully served by PPGC. Although, the opinion in *O'Bannon* does not expressly state whether the state's decertification of the facility caused it to go out of business entirely, we are satisfied that decertification had a crippling effect on the institution even if it did not cause it to shut down totally. Not so in this case. In sum, the institution in *O'Bannon* was decertified for reasons having to do with the quality of care provided to patients. Here, the state has not impugned the quality of PPGC's care, and it will continue in business: Only its Medicaid patients will be prevented from receiving treatment there. Although this fact alone does not automatically confer a private right of action, the dissent cannot avoid this distinction, which makes *O'Bannon* fully inapplicable.

## CONCLUSION

We hold that the Individual Plaintiffs met their burden of proving their entitlement to a preliminary injunction. We also hold that the district court did not abuse its discretion in preliminarily enjoining LDHH's termination of PPGC's Medicaid provider agreements. In so doing, we have addressed only the facts and issues necessary to address the district court's preliminary injunction. Our determinations do not bind any future summary judgment or

No. 15-30987

merits panels.[104] The district court's preliminary injunction is AFFIRMED and this case is REMANDED for further proceedings consistent herewith.

---

[104] *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

No. 15-30987

PRISCILLA R. OWEN, Circuit Judge, dissenting:

I respectfully dissent because the majority opinion conflicts with the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center*, which held that a Medicaid beneficiary does not have a right based on 42 U.S.C. § 1396a(a)(23) to challenge *the merits* of a State's assertion that a provider of Medicaid services is no longer qualified to provide Medicaid services or to challenge the State's termination of a provider's Medicaid agreements on the basis of the provider's noncompliance with state and federal regulatory requirements.[1]  In *O'Bannon*, the Court held that § 1396a(a)(23) did not give Medicaid patients a right to litigate whether a provider was "qualified" within the meaning of that statute.[2]  The majority opinion in the present case holds just the opposite, and none of the bases on which it attempts to distinguish *O'Bannon* withstands scrutiny.

In the case before our court, the Secretary of the Louisiana Department of Health and Hospitals (LDHH) gave notice that it intended to terminate the Medicaid provider agreements of Planned Parenthood Gulf Coast, Inc. (PPGC), asserting as its reasons for termination, in part, PPGC's settlement of a federal False Claims Act suit; provider audits regarding false claims; another pending federal False Claims Act suit in which the federal district court had stated that the Complaint's allegations in that case "allow[] the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims"; misrepresentations; and a pending investigation into PPGC's conduct.  PPGC did not avail itself of state administrative or judicial proceedings to contest any of these grounds, though avenues for such a contest existed.  Instead, PPGC and three of its patients sued in federal district court to set aside the proposed

---

[1] 447 U.S. 773, 775-77, 785 (1980).

[2] *Id.* at 786.

terminations.    PPGC's claims, asserting Equal Protection and other
constitutional violations, were not the basis for the preliminary injunction the
district court granted staying the terminations and are not the subject of this
interlocutory appeal.  The only question before this panel is whether PPGC's
*patients* have a right to challenge LDHH's determination that PPGC is not a
"qualified" provider.  The majority opinion concludes that the so-called "free-
choice-of-provider" provision in § 1396a(a)(23) confers such a right upon
Medicaid beneficiaries, contrary to the holding in *O'Bannon*.

If and when PPGC successfully challenges LDHH's determination that
PPGC is no longer a qualified provider, then PPGC's patients may sue to
vindicate rights granted by § 1396a(a)(23).  But PPGC has not yet made such
a showing.

**I**

Three of PPGC's patients, Doe #1, Doe #2, and Doe #3 (the "Individual
Plaintiffs"), who are recipients of Medicaid benefits, contend that LDHH lacked
any legitimate basis for terminating PPGC's Medicaid provider agreements
and that PPGC is a "qualified" provider of Medicaid services within the
meaning of 42 U.S.C. § 1396a(a)(23).  The Individual Plaintiffs have brought
an action under 42 U.S.C. § 1983.  The federal district court considered only
the Individual Plaintiffs' claims in granting the preliminary injunction that is
at issue in the interlocutory appeal before our court.  The Individual Plaintiffs
do not have a § 1983 cause of action unless there has been a violation of a
federal constitutional or statutory right.

I agree that § 1396a(a)(23), which is set forth in the margin,[3] provides a
right upon which a Medicaid patient may base a suit under § 1983 when she

---

[3] 42 U.S.C. § 1396a(a)(23) provides:

No. 15-30987

has been denied access to a provider that a State has determined meets all state and federal Medicaid requirements and qualifications. However, § 1396a(a)(23) does not give a patient the right to contest a State's determination that a provider is not "qualified" to provide Medicaid services or a determination that the provider has not otherwise met state or federal statutory requirements. The Supreme Court's decision in *O'Bannon* makes this clear.

The question in *O'Bannon* was whether residents of a nursing home had a "constitutional right to participate in . . . revocation proceedings," in which a federal entity and a state entity sought to revoke the nursing home's authority to provide care to Medicaid recipients.[4] The Court held that the recipients did

---

(a) Contents

A State plan for medical assistance must— . . .

> (23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance in a primary care case-management system (described in section 1396n(b)(1) of this title), a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title, except as provided in subsection (g) of this section, in section 1396n of this title, and in section 1396u-2(a) of this title, except that this paragraph shall not apply in the case of Puerto Rico, the Virgin Islands, and Guam, and except that nothing in this paragraph shall be construed as requiring a State to provide medical assistance for such services furnished by a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan or by a provider or supplier to which a moratorium under subsection (kk)(4) is applied during the period of such moratorium[.]

[4] 447 U.S. at 775-76.

not have such a right.[5] The Court's due process analysis required it to decide what substantive rights 42 U.S.C. § 1396a(a)(23) bestows upon Medicaid beneficiaries. The Court concluded that this provision "gives [Medicaid] recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified."[6] However, the Court then said, "[b]ut it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified."[7] The nursing home residents had contended that they "were entitled to an evidentiary hearing on the merits of the decertification decision before the Medicaid payments were discontinued."[8] In denying this relief, the Court explained "decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility."[9] Because the patients had no *substantive* right to demand care from a provider that had been decertified, they had no due process rights to participate in a hearing regarding certification or decertification of the provider.[10]

The decision in *O'Bannon* controls here. Medicaid patients do not have rights under 42 U.S.C. § 1396a(a)(23) that permit them to sue, under § 1983, to contest *the merits* of LDHH's allegations supporting the proposed termination of PPGC's Medicaid provider agreements.

---

[5] *Id.* at 775.

[6] *Id.* at 785.

[7] *Id.*

[8] *Id.* at 777.

[9] *Id.* at 785-86.

[10] *Id.* at 775, 785.

No. 15-30987

## II

The majority opinion attempts to distinguish *O'Bannon* on various grounds.  But none of those grounds are valid.

## A

The majority opinion states that *O'Bannon* "is inapposite" because "[t]here, the patient-plaintiffs' injuries were alleged to stem from a deprivation of due process rights" and that "[i]n contrast, the Individual Plaintiffs here assert the violation of a substantive right."[11]  These statements reflect a failure to appreciate that there is no right to due process unless there is a substantive right that may be vindicated if adequate process is accorded.  The Supreme Court concluded in *O'Bannon* that when a State declares that a particular provider is not qualified to provide Medicaid services, a Medicaid recipient has no "life, liberty, or property" interest arising from 42 U.S.C. § 1396a(a)(23) that is affected.[12]  The Due Process Clause does not confer a "right to a hearing" in the abstract; rather, it does so only as a prerequisite to a deprivation of "life, liberty, or property."[13]  Before a plaintiff can prevail on a due process claim, she must show that a liberty or property interest exists and that the State has interfered with that interest.[14]

Though the Medicaid recipients in *O'Bannon* claimed that they were "entitled to an evidentiary hearing on the merits of the decertification

---

[11] *Ante* at 20.

[12] *O'Bannon*, 447 U.S. at 787.

[13] U.S. CONST. amend. XIV, § 1.

[14] *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  (citations omitted) (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983) and *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 (1972))).

decision,"[15] they were first required to show that the State had deprived them of a "liberty or property interest"[16] by terminating reimbursement agreements with their preferred Medicaid provider.[17]  The recipients identified 42 U.S.C. § 1396a(a)(23) as a source of a substantive liberty or property interest.[18]  The Supreme Court therefore examined whether § 1396a(a)(23) gives recipients a right to demand care from a particular provider when that provider had been decertified as a Medicaid provider.  The Court concluded that recipients do not have such a right.[19]  The Court characterized the recipients' argument as claiming that § 1396a(a)(23) "give[s] them a property right to remain in the home of their choice."[20]  In rejecting that claim, the Court explained that although Medicaid recipients have a "right to continued benefits to pay for care in the qualified institution of [their] choice," they have "no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified."[21]  In the present case, the majority opinion is plainly mistaken in characterizing the *O'Bannon* decision as dealing only with "due process," but not substantive, rights under 42 U.S.C. § 1396a(a)(23).[22]

---

[15] *O'Bannon*, 447 U.S. at 777.

[16] *See Thompson*, 490 U.S. at 460.

[17] *O'Bannon*, 447 U.S. at 784.

[18] *Id.* ("The patients have identified two possible sources of such a right."); *id.* at 784-85 (discussing 42 U.S.C. § 1396a(a)(23) as one of the identified sources).

[19] *Id.* at 785.

[20] *Id.* at 784.

[21] *Id.* at 786.

[22] *But see Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 977 (7th Cir. 2012) (distinguishing *O'Bannon* on the basis that "the free-choice-of-provider statute was raised in the context of a due-process claim" and that "[t]his is not a due-process case").

No. 15-30987

## B

## 1

The majority opinion says "[t]his case is different" from *O'Bannon* because "Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license."[23]   The majority opinion concludes that "this distinction . . . makes *O'Bannon* fully inapplicable."[24]   As discussed below,[25] *O'Bannon*'s analysis of Medicaid beneficiaries' rights under 42 U.S.C. § 1396a(a)(23) did not turn on whether the State revoked the nursing home's authorization to continue functioning as a nursing home.   But before *O'Bannon* is examined on that score, it is important to understand that the majority opinion's interpretation of § 1396a(a)(23) finds no support in its text and conflicts with the Government's understanding of when, based on § 1396a(a)(23), Medicaid patients can and cannot sue to challenge termination of a Medicaid provider's agreement.

The majority opinion concludes that whenever a State terminates a provider's Medicaid agreement, regardless of the grounds for termination, a patient may sue to contest the termination, unless the State also precludes the provider from providing services or care to all patients, not just Medicaid recipients.[26]   This construction of § 1396a(a)(23) is plainly mistaken.   Under

---

[23] *Ante* at 22.

[24] *Ante* at 42.

[25] *See infra* Part II(C)(1).

[26] *Ante* at 36 ("To be sure, the general grounds for termination invoked by LDHH— fraud, misrepresentations, and investigations—might well relate to a provider's qualifications.   States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance.   Medicaid's 42 U.S.C. § 1396a(p)(1)'s exclusionary provision makes that clear. . . .   It bears repeating, however, that LDHH has taken no action to revoke PPGC's license and has not called into

No. 15-30987

federal statutory and regulatory provisions, a State may terminate a provider's Medicaid agreement on many grounds, and it is not a prerequisite for such terminations that the State preclude a provider from providing services to any and all patients.

Subsection 1396a(p)(1) provides that "[i]n addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan . . . for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."[27]  A State may terminate a provider's agreement for many reasons even though the State does not seek to prohibit a provider from providing health care to the "general population" or to "revoke[e] its license."[28]

The United States Government does not agree with the majority opinion's assertion that *O'Bannon* is limited to situations in which a State seeks to prevent a provider from treating or providing services to all patients, not just Medicaid patients.  The Government has filed an amicus brief in this

---

question any qualification that enables PPGC to offer medical care generally."); *see also ante* at 37 ("We repeat yet again for emphasis that LDHH has never once complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license."); *ante* at 37 ("LDHH would deny PPGC's services only to Medicaid recipients while leaving all other individuals free to obtain the very same services from PPGC.").

[27] *See* 42 U.S.C. § 1396a(p)(1) ("In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."); § 1320a-7(b)(6) (permitting exclusion for excessive charges or  unnecessary services); § 1320a-7(b)(7) (permitting exclusion for "an act which is described in section 1320a-7a, 1320a-7b, or 1320a-8 of this title"); *id.* § 1320a-7a(a)(1)(A) (presenting a claim "for a medical or other item or service that the person knows or should know was not provided as claimed").

[28] *Ante* at 22.

51

case that sets forth a number of grounds on which a State may terminate a provider's agreement.[29]  Termination can occur because of, among other acts or omissions,[30] a provider's excessive charges;[31] fraud, kickbacks, or other prohibited activities;[32] failure to provide information;[33] failure to grant immediate access under specified circumstances;[34] default on loan or scholarship obligations;[35] or false statements or material misrepresentations of fact in certain circumstances.[36]  The Government acknowledges that a patient has no right under § 1396a(a)(23) on which to base a § 1983 suit challenging a provider's termination on any of these grounds.  But the majority opinion appears to limit *O'Bannon*'s application more narrowly than the Government advocates.

The majority opinion says that it "makes sense" that patients cannot "freely intervene in state enforcement actions against facilities that violate health and safety standards."[37]  Why, then, does it "make[] sense" to allow patients to "intervene" "freely" when a State asserts, as LDHH asserted, that its basis for termination is that a Medicaid provider has engaged in submitting false claims for services that were never provided and for medically unnecessary services or items, in violation of federal regulations?[38]

---

[29] *See* 42 U.S.C. §§ 1396a(p)(1)-(3), 1320a-7, 1395cc(b)(2).

[30] *Id.* § 1320a-7(b).

[31] § 1320a-7(b)(6).

[32] § 1320a-7(b)(7).

[33] § 1320a-7(b)(9)-(11).

[34] § 1320a-7(b)(12).

[35] § 1320a-7(b)(14).

[36] § 1320a-7(b)(16).

[37] *Ante* at 21-22.

[38] *See* 42 U.S.C. §§ 1396a(p), 1320a-7(b)(6).

No. 15-30987

**2**

In the present case, the majority opinion says that PPGC's Medicaid patients who have sued LDHH are not "challenging 'the merits of'" its decision to terminate PPGC's Medicaid provider agreements.[39]  Yet, some of the grounds LDHH gave for termination at least facially pertain to PPGC's qualifications to continue as a Medicaid provider, and the Individual Plaintiffs do in fact contend that, when examined on their merits, none of those grounds is an adequate basis for termination.  The majority opinion agrees, concluding that since the Individual Plaintiffs will likely prevail on their contention that PPGC is a qualified provider, the Individual Plaintiffs have the right to sue to obtain Medicaid services from that qualified provider.  This reasoning is circular, and it permits Medicaid recipients to do precisely what *O'Bannon* said they have no statutory right to do.  The Supreme Court held in *O'Bannon* that Medicaid patients cannot challenge the merits of whether a provider is a qualified Medicaid provider.

The majority opinion relatedly says, "[w]hen, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite."[40]  But LDHH's notice of intent to terminate PPGC's provider agreements did assert acts or omissions that would come within prohibitions in the federal statutory and regulatory scheme.

The majority opinion recognizes that "States may . . . exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(1) and on analogous state law grounds relating to a provider's qualification,"[41] though apparently the opinion

---

[39] *Ante* at 22.
[40] *Ante* at 22.
[41] *Ante* at 29.

adds the additional qualification that a State may not terminate a provider's Medicaid agreement unless the State also precludes the provider from providing services to patients, generally,[42] as already discussed above.[43] Putting that gloss on § 1396a(p)(1) aside for the moment, the opinion also says, "[t]o be sure, the general grounds for termination invoked by LDHH—fraud, misrepresentations, and investigations—might well relate to a provider's qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance."[44] The opinion notes that "Medicaid's 42 U.S.C. § 1396a(p)(1)'s exclusionary provision makes that clear."[45] The opinion then proceeds to determine, *on the merits*, that none of the grounds given by LDHH for terminating PPGC's provider agreement are "authorized by § 1396a(p)."[46] The majority opinion errs not only in permitting Medicaid recipients to litigate whether a provider is qualified, but also in incorrectly analyzing the grounds LDHH identified for its proposed termination of PPGC's provider agreements.

---

[42] *See ante* at 29:

> While as a general rule a state may terminate a provider's Medicaid agreements for reasons bearing on that provider's general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider's authorization to offer those same services to non-Medicaid patients. "Qualified" means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." States may also exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(1) and on analogous state law grounds relating to a provider's qualification. Although states retain broad authority to define provider qualifications and to exclude providers on that basis, their authority is circumscribed by the meaning of "qualified" in this context. (footnote omitted) (quoting *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012)).

[43] *See supra* Part II(B)(1).
[44] *Ante* at 36.
[45] *Ante* at 36.
[46] *Ante* at 30.

No. 15-30987

The letter informing PPGC of LDHH's intent to terminate its Medicaid provider agreements included several independent grounds for termination. One was that PPGC had filed false Medicaid or Medicare claims. LDHH's stated bases for believing that PPGC had done so were provider audits, settlement of a federal False Claims Act suit, and an opinion and order in a federal False Claims Act case pending at the time, in which the court said that it could draw a reasonable inference from the Complaint in that case that PPGC had knowingly filed false claims. LDHH's letters to PPGC stated:

> Also under consideration in our departmental proceedings are provider audits and federal false claims cases against Planned Parenthood of America (PPFA) affiliates. Included among these are pending federal false claims cases against PPGC, one in which the presiding judge found that the information already provided "allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." Memorandum Opinion and Order at 17, *Carroll v. Planned Parenthood Gulf Coast*, 4:12-cv-03505 (S.D. TX, Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program.

The panel's majority opinion gives short shrift to this ground for termination. The opinion states that "[a]t the most, LDHH has simply pasted the labels of 'fraud' and 'misrepresentations' on PPGC's conduct."[47] However, LDHH contemplated that there would be administrative proceedings following the letters that expressed its intent to terminate PPGC's provider agreements. The notice letters each advised in their opening paragraph that termination would take effect only after "final determination, judgment, completion, withdrawal from, or termination of all administrative and/or legal proceedings in this matter. Such proceedings include, but are not limited to, informal

---

[47] *Ante* at 36.

55

hearings, administrative appeals, appeals for judicial review, appellate judgments, and/or denials of writ applications." But, as the majority opinion repeatedly recognizes,[48] there was never even an informal hearing at which evidence would be presented because PPGC declined to participate in any administrative proceedings at all.

In any event, at least some of LDHH's grounds for termination were within the scope of the federal statutes and regulations that permit a State to terminate a provider's Medicaid agreement for fraud or improprieties in billing practices. Details of alleged fraud and improper billing practices were contained in the settlement agreement described in LDHH's notices of termination, which was PPGC's settlement of a federal False Claims Act suit initiated by Karen Reynolds, a former PPGC former employee.[49] The allegations in that suit were serious and included assertions that over a five-and-a-half-year period, PPGC had submitted false claims for medically unnecessary or unneeded items and services, and items and services that were never provided by PPGC. PPGC paid $4,300,000 to settle that suit. The settlement agreement reflects that both the United States and the State of Texas asserted claims against PPGC for fraud in addition to those alleged by the Qui-Tam plaintiff.[50] Though the settlement agreement reflects that PPGC

---

[48] *See, e.g., ante* at 8 ("PPGC has not requested either a hearing or an administrative appeal.").

[49] ROA 498, 727.

[50] The settlement agreement recites:

    D.    The United States contends that PPGC submitted false claims and made false statements to the United States in connection with claims that PPGC submitted to the United States under the Social Security Block Grant, Tide XX of the Social Security Act, 42 U.S.C. §§ 1397 et seq. (SSBG), the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (Medicaid Program), and the Women's Health Program (WHP), a Medicaid research and demonstration waiver created under Section 1115(a) of the Social

No. 15-30987

did not admit liability, the agreement memorializes that (1) PPGC agreed to wire transfer to the United States $4,300,000, (2) the United States agreed to pay $1,247,000 of the $4,300,000 to the Qui-Tam plaintiff, (3) the United States paid $500,831 to the State of Texas "which is the Medicaid portion of the Settlement Amount, less Texas' portion of the [Qui-Tam plaintiff's] Share," (4) the balance was retained by the United States Government, and (5) PPGC agreed to pay the Qui-Tam plaintiff's attorney's fees and attorney's costs in a separate written settlement agreement with the Qui-Tam plaintiff. The settlement expressly reserved the rights of the United States and the State of Texas to maintain administrative actions to exclude PPGC from federal health care programs, including Medicare.

The fact that PPGG settled these claims with a disclaimer that it was not admitting liability does not make the factual allegations contained in the settlement agreement disappear. If true, any one of the allegations set forth

Security Act, 42 U.S.C. § 1315(a), and implemented by Texas under former Tex. Hum. Res. Code § 32.0248.

E.      Texas contends that PPGC submitted false claims and made false statements to Texas in connection with claims that PPGC submitted to Texas under the Medicaid Program and WHP in violation of the TMFPA, Tex. Hum. Res. Code. Ann. § 36.001 et seq.

F.      The Government contends that it has certain civil and administrative claims, as specified in Sections III.B, III.C, and III.E below, against PPGC for engaging in the following conduct:

submission of claims for payment to the United States and the State of Texas during the time period between July 30, 2003, through February 28, 2009, through the Medicaid Program, SSBG, and WHP when such items and services were (i) medically unnecessary or not medically indicated; (ii) not actually provided by PPGC; or (iii) improperly documented in patient charts as being provided even though they had not been performed. Covered Conduct is further limited to claims based on the following Current Procedural Terminology ("CPT") and local codes . . . [detailed listing of codes and terminology omitted in this opinion in the interest of brevity].

57

in the settlement agreement would have been grounds for LDHH's termination of PPGC's Medicaid provider agreements.

The district court proceeded to rule, on the merits, that LDHH had previously analyzed the claims in the Reynold's suit and did not think they had much credence.[51]  Even if, ultimately, that is shown to be true, the point is that the district court examined grounds that at least facially were adequate for termination under § 1396a(p)(1), but concluded that, *on the merits*, those grounds were not likely to prevail.

Both the district court, and the panel's majority opinion, permit the Individual Plaintiffs to challenge LDHH's determination that PPGC is not a "qualified" provider under the Medicaid statutes and regulations.  In so doing, both courts have failed to adhere to *O'Bannon*, which held that when a State concludes that a provider is not qualified, even if that determination is erroneous, a Medicaid recipient does not have a right by virtue of 42 U.S.C. § 1396a(a)(23) that can be vindicated by a § 1983 suit.

## C

The majority opinion concludes that there is a "determinative distinction between this case and *O'Bannon*" and that "this distinction . . . makes *O'Bannon* fully inapplicable."[52]  The distinction, the majority opinion asserts, is that in *O'Bannon*, "the Supreme Court held that none of [the nursing home's] former clientele—implicitly, whether covered by Medicaid or commercial insurance—had standing to advance constitutional claims because they were only affected incidentally," and in *O'Bannon*, "the state decertified the medical provider *totally* for failure to meet statutory and regulatory requirements for

---

[51] The district court wrote that "Plaintiffs have credibly shown that DHH was aware of the *Reynolds* Settlement long before October 14, 2015, with Defendant's own emails suggesting that it did not find it sufficient to provide "credible evidence" of Medicaid fraud."

[52] *Ante* at 41-42.

certification as a skilled nursing facility."[53]  Two premises in this assertion are incorrect.

**1**

The opinion in *O'Bannon* does not say that the nursing home facility was "totally" prohibited from providing care to any nursing home resident.  The facility was decertified as a Medicaid provider, not prohibited from operating as a nursing home.[54]

Specifically, as to the factual underpinnings of *O'Bannon*, there is no indication in the Supreme Court's opinion that "decertification" of the nursing home under the Medicaid statutes required it to cease providing nursing home care to patients who were not Medicaid beneficiaries.  The Supreme Court's opinion reflects that the nursing home had first been certified in 1967 by the Department of Health, Education, and Welfare (HEW) as a "skilled nursing facility," which made it eligible to enter into one-year Medicare and Medicaid provider agreements with HEW and the Pennsylvania Department of Public Welfare (DPW).[55]  The home "was decertified in 1974 as a result of substantial noncompliance with both state and federal requirements,"[56] but in 1976, it was recertified by HEW.[57]  In 1977, HEW once again decertified the nursing home under the Medicaid statutes, and HEW and DPW once again decided not to renew the nursing home's one-year Medicaid provider agreements due to failure to meet statutory and regulatory standards for skilled nursing homes.[58]  There is no indication in *O'Bannon*, the Court of Appeals' decision that it

---

[53] *Ante* at 41-42 (emphasis added).
[54] *See O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 775-76 & nn.2-3 (1980).
[55] *Id.* at 775 & n.1.
[56] *Id.* at 775 n.1.
[57] *Id.* at 775.
[58] *Id.* at 775-76.

reversed,[59] or the briefing in the Supreme Court,[60] that the nursing home was prohibited from providing services to residents who were not Medicaid or Medicare beneficiaries as the majority opinion in the present case posits, and therefore that the home was required to cease operations "totally,"[61] during the interim between 1974 and 1976, or when the home was again decertified in 1977.

The *O'Bannon* opinion reflects that in response to the 1977 decertification, six Medicaid recipients sued to challenge that determination and the termination of the nursing home's Medicaid provider agreements.[62] Their "complaint alleged that termination of *the [Medicaid] payments* would require [the nursing home] to close,"[63] not that the nursing home had lost its license or had been closed by the State. The home was in jeopardy of closing due to economic factors, since so many of its residents (approximately 180 of 198) were Medicaid recipients,[64] not because the home had been "decertified . . . totally"[65] by State or federal agencies, as the majority opinion in the present

---

[59] *Town Court Nursing Ctr., Inc. v. Beal*, 586 F.2d 280 (3d Cir. 1978), *rev'd sub nom. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980).

[60] Brief for Petitioner, *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980) (No. 78-1318), 1979 WL 213543; Brief for Respondents, *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980) (No. 78-1318), 1979 WL 199370; Brief for the Secretary of Health, Education, and Welfare, *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980) (No. 78-1318), 1979 WL 199369.

[61] *See ante* at 41-42.

[62] *O'Bannon*, 447 U.S. at 777.

[63] *Id.* (emphasis added).

[64] *See id.* at 775-77, 777 n.5 (recounting that Town Court operated a 198-bed facility and six Medicaid recipients residing in the facility "filed their action on behalf of a class of all Medicaid recipients in the home, [though] the District Court never certified the class," while framing the question for decision as "whether approximately 180 elderly residents of a nursing home operated by Town Court Nursing Center, Inc., have a constitutional right to a hearing before a state or federal agency may revoke the home's authority to provide them with nursing care at government expense").

[65] *Ante* at 41-42.

case asserts repeatedly.[66] Whether the nursing home facility in *O'Bannon* was required to cease operations had no bearing on the Supreme Court's holding that 42 U.S.C. § 1396a(a)(23) is not a font of substantive rights flowing to Medicaid patients that permits them to sue to set aside the termination of a provider's Medicaid or Medicare agreements on the basis that the provider failed to comply with certain statutory or regulatory requirements.

The majority opinion in the present case admits that it is on shaky ground in asserting that "decertification" in *O'Bannon* meant complete closure of the home by order of the State. The panel's opinion hedges, saying, "[a]lthough, the opinion in *O'Bannon* does not expressly state whether the state's decertification of the facility caused it to go out of business entirely, we are satisfied that decertification had a crippling effect on the institution even if it did not cause it to shut down totally."[67] To what statutory language in 42 U.S.C. § 1396a(a)(23) is "a crippling effect on the institution" pertinent? What language in § 1396a(a)(23) differentiates between instances in which termination of a provider's Medicaid agreement results in a "total[]"[68] closure

---

[66] *See, e.g., ante* at 20 ("[*O'Bannon*] is inapposite. There, the patient-plaintiffs' injuries were alleged to stem from a deprivation of due process rights, specifically, the right to a hearing to contest the state's decertification of a health care provider, not just its Medicaid qualification."); *ante* at 22 ("This case is different [from *O'Bannon*]. Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license."); *ante* at 36 ("It bears repeating, however, that LDHH has taken *no action* to revoke PPGC's license and has not called into question any qualification that enables PPGC to offer medical care generally."); *ante* at 42 ("[T]he institution in *O'Bannon* was decertified for reasons having to do with the quality of care provided to patients. Here, the state has not impugned the quality of PPGC's care, and it will continue in business: Only its Medicaid patients will be prevented from receiving treatment there. The dissent cannot avoid this distinction, which makes *O'Bannon* fully inapplicable.").

[67] *Ante* at 42.

[68] *Ante* at 42.

No. 15-30987

of a facility (or a "crippling effect")[69] and termination of a Medicaid agreement having little impact on the facility's operations?    Nothing in the Supreme Court's decision in *O'Bannon* even alludes to such a distinction.   The Court's reasoning and its holding in *O'Bannon* would have been the same had the termination of the Medicaid provider agreements in that case affected only a few residents.  The residents who sued in *O'Bannon*, all Medicaid beneficiaries, would have had the same arguments that they made in the Supreme Court. They would have been required to move as a result of the decertification, even if scores of other residents (who did not receive Medicaid benefits) remained in the nursing home.

**2**

Nor was *O'Bannon* decided on standing principles applicable to nursing home residents generally.   The question before the Court was whether 42 U.S.C. § 1396a(a)(23) gave Medicaid beneficiaries "a right to continued residence in the home of one's choice."[70]   The issue actually decided was not whether a resident of a nursing home whose care is paid for by private funds has standing to contest a State's closure of the home.   As just noted, the State did not require the home to be closed, and the legal question before the Court was whether Medicaid beneficiaries could contest the termination of the nursing home's Medicaid provider agreements by state and federal agencies. The focus of the Supreme Court's decision in *O'Bannon* was the extent of rights granted by the Medicaid and Medicare statutory provisions.[71]   The Supreme Court's construction of 42 U.S.C. § 1396a(a)(23) applies in the present case.

---

[69] *Ante* at 42.

[70] *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980).

[71] *See id.* ("Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice.  Title 42 U.S.C. § 1396a(a)(23) (1976 ed., Supp.II) gives recipients the right to choose among a range of *qualified* providers, without government interference."); *id.* at 785-90.

No. 15-30987

**D**

The panel's majority opinion says that it will not follow *O'Bannon* because "[r]eading *O'Bannon* to foreclose every *recipient's* right to challenge a disqualification decision would render the right guaranteed by § 1396a(a)(23) nugatory."[72]  First and foremost, this court is not free to disregard the Supreme Court's holding in *O'Bannon*, which was that § 1396a(a)(23) does not give a Medicaid recipient the right to challenge a determination that a provider is unqualified.[73]  Second, *O'Bannon*'s holding does not render rights under § 1396a(a)(23) "nugatory."  The Supreme Court held that § 1396a(a)(23) "confers an absolute right to be free from government interference with the choice" to receive services from a qualified provider.[74]  Under § 1396a(a)(23)(A), "any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required, . . . who undertakes to provide him such services," and under § 1396a(a)(23)(B), the systems and entities specified "shall not restrict the choice of the qualified person from whom the individual may receive services," with certain limitations.

That Medicaid recipients do not have a right to challenge a State's decision that a particular provider is unqualified does not mean that the State's decision is unreviewable.  In the present case, for example, the provider, PPGC, had the right to challenge the termination of its provider agreements in state administrative proceedings.[75]  It did not do so.  However, in the federal district court proceedings, PPGC has asserted constitutional violations and may also have a § 1983 claim based on rights under provisions of the Medicaid

---

[72] *Ante* at 21.

[73] *O'Bannon*, 447 U.S. at 785.

[74] *Id.*

[75] *See* LA. STAT. ANN. § 46:437.4; LA. ADMIN. CODE tit. 50, §§ 4161, 4211, 4213.

63

statutes and regulations (other than § 1396a(a)(23) and regulations promulgated under it) to challenge the State's termination of its provider agreement. Even if PPGC is limited to state administrative proceedings and state-court review, which is doubtful, that is not a basis for construing § 1396a(a)(23) to allow PPGC's patients to challenge the State's termination of PPGC's provider contracts when the Supreme Court has held that § 1396a(a)(23) does not permit them to do so.

The argument that § 1396a(a)(23) should be construed to give patients a right to contest a State's termination of a provider's Medicaid agreement for cause is also undermined by the fact that § 1396a(a)(23) assumes a willing provider who "undertakes to provide . . . such services" to the Medicaid recipient. In instances in which a provider does not challenge the termination of its Medicaid agreement, it cannot be said to be undertaking to provide Medicaid services to its patients. The Medicaid statutory scheme contemplates that only the provider can contest a determination that it is not qualified. There is no need to give Medicaid patients that right. If the provider is successful in its challenge (as PPGC may ultimately be in the present case when *its* claims are addressed) and a State were to *then* seek to prevent patients from seeking treatment or services from that qualified provider, patients could sue based on § 1396a(a)(23).

I submit that the majority opinion has created a right to remedy what it perceives to be a violation of law by the State of Louisiana. But ends do not justify means, and any violation of law by the State can be remedied.

### III

The majority opinion relies upon decisions from the Seventh and Ninth Circuits that permitted patients to challenge state laws that excluded Planned Parenthood from providing health-care services to recipients of state-

64

administered funds unless Planned Parenthood ceased performing privately funded, legal abortions.[76] The purpose of the state laws at issue in those two cases was to prevent indirect subsidization of abortion.[77] In neither case did the State assert that the provider had settled False Claims Act suits, made misrepresentations, or was under investigation. In any event, the reasoning of those decisions is contrary to *O'Bannon* and is undermined by the recognition in those opinions that there are many circumstances in which a State may terminate a provider's Medicaid provider agreement and yet the provider's patients would be unable to sue to challenge those terminations.[78]

The majority opinion in the case before us today cites the Sixth Circuit's decision in *Harris v. Olszewski*.[79] But that decision does not support the majority opinion's conclusion that in some circumstances, a patient may challenge a determination that a provider is not "qualified" to provide services. In *Harris*, as a cost-savings measure, the State contracted with a sole provider of incontinence products after a competitive-bidding process.[80] A Medicaid benefits recipient filed suit seeking to certify a class and to enjoin enforcement of the single-source-provider contract.[81] There was no contention that other providers were unqualified; the Medicaid recipients sought to obtain supplies from other qualified providers.[82] The Sixth Circuit concluded that the patients had a right arising from § 1396a(a)(23) to bring a § 1983 claim.[83] That

---

[76] *Ante* at 18-20 (citing *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013) and *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012)).

[77] *See, e.g.*, *Planned Parenthood of Ind.*, 699 F.3d at 967 ("The point is to eliminate the indirect subsidization of abortion.").

[78] *See Betlach*, 727 F.3d at 973; *Planned Parenthood of Ind.*, 699 F.3d at 979.

[79] *Ante* at 18, 19 (citing *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006)).

[80] *Harris*, 442 F.3d at 460, 463.

[81] *Id.* at 460.

[82] *Id.*

[83] *Id.* at 459.

conclusion is entirely consistent with *O'Bannon*, which held that under § 1396a(a)(23), "a patient has a right to continued benefits to pay for care in the qualified institution of his choice."[84] Nevertheless, the Sixth Circuit denied the requested relief, ultimately holding that the "single-source contract for incontinence products complied with statutory and regulatory requirements for an exemption to the freedom-of-choice provision."[85]

## IV

The majority opinion observes that because § 1396a(a)(23) "speaks only in terms of recipients' rights rather than providers' rights," "the right guaranteed by § 1396a(a)(23) is vested in Medicaid recipients rather than providers."[86]  I agree with that observation and the majority opinion's conclusion that providers "cannot bring a challenge pursuant to § 1396a(a)(23)."[87]  However, as discussed above, a provider has other avenues to seek redress when a State terminates its status as a qualified provider for purposes of Medicaid.

\* \* \*

The State of Louisiana may have improperly terminated PPGC's Medicaid provider agreements, and if so, PPGC may pursue remedies. However, the Supreme Court has held that when a State determines that a particular provider is not qualified to provide Medicaid services, *a patient* has

---

[84] *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 786 (1980).

[85] *Harris*, 442 F.3d at 467, 468-69 (concluding that the State had not violated the freedom-of-choice provision contained in 42 U.S.C. § 1396a(a)(23) because of the statutory exception found in 42 U.S.C. § 1396n(a)(1)(B)).

[86] *Ante* at 20.

[87] *Ante* at 20-21.  *But see Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 965-67 (9th Cir. 2013) (concluding that Planned Parenthood had stated a cause of action under § 1983 based on rights conferred by § 1396a(a)(23)); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972-77 (7th Cir. 2012) (drawing no distinction between Planned Parenthood and its patients in concluding that there is an individual right to sue arising from § 1396a(a)(23)).

No. 15-30987

no life, liberty, or property interest under 42 U.S.C. § 1396a(a)(23) that is implicated or affected.[88] Because the majority opinion has created patients' rights that are not found in § 1396a(a)(23)'s text and because the majority opinion fails to follow the Supreme Court's decision in *O'Bannon*, I must dissent.

---

[88] *O'Bannon*, 447 U.S. at 785-87.